UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**
MAR 2 4 2008
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

SUSAN H. MINEHAN )
13733 Town Line Road )
Silver Spring, Maryland 20906-2113 )
(H) (301) 871-1337 )
Petitioner )
                                    )
    v.                              ) Civil Action No. 08 0499
                                    )
UNITED STATES OFFICE OF SPECIAL COUNSEL )
1730 M Street, N. W., Suite 300     )
Washington, D. C. 20036-4505        )
(202) 653-7188                      )
Respondent                          )
                                    )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PETITIONER'S MOTION FOR COURT APPOINTED COUNSEL

In accordance with the Rules of the United States District Court for the District of Columbia, the following information is provided to assist with determination for appointment of counsel for the Petitioner.

(i) The nature and complexity of the action:

Nature of Action

The Petitioner contends that what started as an administrative clerical error in the Civilian Personnel Office (CPO) at Walter Reed Army Medical Center (WRAMC), Washington, D. C., materialized into a lengthy and unresolved problem when WRAMC, her former agency, failed to implement *nondiscretionary*, and in fact, *mandatory* application of newly revised position classification standards for the Petitioner's position #00577. The standards were disseminated by the Office of Personnel Management (OPM), Washington, D. C., and authorized by the Classification Act of 1949.

1

3

The Petitioner further contends that had the standards been applied to the position she occupied, the position would have been upgraded from a GS-11 to a GS-12 as determined by experts in the position classification field.

Complexity of Action

The Petitioner was employed by Walter Reed Army Medical Center, Washington, D.C.. On or about June 1993, a reorganization of the Petitioner's branch took place whereby all employee positions were being evaluated for upgrades. When *all* employees in the branch were subsequently promoted, with the exception of the Petitioner, who was the branch chief and supervisor, the Petitioner filed a request for an Inspector General (IG) investigation with the Office of the Inspector General, U. S. Army Medical Command (MEDCOM), Fort Sam Houston, Texas, during mid November 1995. The MEDCOM was Walter Reed's higher headquarters. The Petitioner sought help from the MEDCOM IG, because WRAMC IG assistance in the past had been unsuccessful. The Petitioner was seeking a proper grade determination on Position Description (PD) #00577, a position she occupied as a GS-11, and a salary commensurate with the determination. Pattie Campbell was assigned to conduct the investigation and did so in May 1996 when she flew to Washington, D. C. and spoke directly with several personnel representatives in the Civilian Personnel Office, WRAMC. The investigation exposed the fact that the Petitioner's position #00577 should have been upgraded to the GS-12 level.

The Petitioner fully anticipated corrective action following the Inspector General investigation; however, the WRAMC Commanding General had apparently made a decision not to comply with any recommendations made by the IG.

The Petitioner subsequently sought assistance from independent contract classifiers to validate the GS-12 finding as conveyed during the IG investigation. The Petitioner found that action necessary particularly because WRAMC did not take any corrective action. In each case, experts in the classification field found Position #00577 to be a GS-12 following application of the August 1990 newly revised classification standards.

In the interim, WRAMC had also forwarded the position description to their higher headquarters for evaluation. Their result was a GS-11. The Petitioner contacted WRAMC's higher headquarters on several occasions to define the differences between the GS-11 versus the GS-12 evaluation results. Higher headquarters would not accommodate the Petitioner. She ultimately forwarded their evaluation results to an independent contract classifier and learned that the higher headquarters' evaluation contained numerous inaccuracies. The Petitioner repeatedly notified higher headquarters that an error had potentially occurred; however, higher headquarters was not willing to revisit the issue. The matter was closed.

The Petitioner maintained her writing campaign to WRAMC officials and other agencies/organizations for assistance, to include the Office of Personnel Management, the United States Office of Special Counsel, and the Merit Systems Protection Board; however, for various policy reasons, she did not prevail. Her efforts extended over a period of many years.

The Petitioner learned from Comptroller General Decision B-134820 (37 Comp. Gen. 492) that the "administrative agency" was required to take action with regard to newly revised position classification standards. The administrative agency for the

Petitioner was Walter Reed Army Medical Center and not their higher headquarters, because WRAMC handled the Personnel Actions for the Petitioner. It was the responsibility of the Petitioner's former agency to conduct the position review and classification evaluation for Position #00577. That never occurred.

Under normal circumstances, had WRAMC conducted a timely evaluation and determined the position grade to be that of a GS-11, the Petitioner would have had appeal rights at the OPM. With appeal rights, the OPM could have verified if the evaluation completed by WRAMC was accurate and if not, what changes were necessary. Because WRAMC never conducted the evaluation on Position #00577, the Petitioner never had appeal rights. When WRAMC's higher headquarters ultimately conducted their evaluation, the Petitioner still did not have appeal rights. She no longer encumbered the position and higher headquarters was not her administrative agency.

The Petitioner maintains that the evaluation issue had a direct impact upon her salary when she was employed, as well as future retirement benefits, because when employed, she was paid based upon an inaccurate lower rate of salary. She adamantly maintains that she was penalized for a clerical administrative error made by the Civilian Personnel Office, WRAMC.

(ii) The potential merit of the pro se party's claim;

The Petitioner's claim is supported by the Classification Act of 1949 and various pertinent and firmly established decisions, i.e., Comptroller General Decision B-134820 (37 Comp Gen 492), Comptroller General Decision B-196638 dated July 10, 1980, and Comptroller General Decision B-165307, 1968. The Petitioner also maintains that her former agency's failure to comply was a violation of laws, rules, and regulations, i.e., a

4

Prohibited Personnel Practice, as outlined by Section 2302(b)(12), Title 5, United States Code (U.S.C.), which states, "Section 2302(b) provides that a federal employee authorized to take, direct others to take, recommend or approve any personnel action may not take or fail to take a personnel action, if taking or failing to take the action would violate any law, rule or regulation implementing or directly concerning federal merit system principles 5 U.S.C. Section 2301." The Petitioner makes specific reference to Section 2301(b)(3) - Equal Pay for Work of Equal Value.

Inasmuch as a classification evaluation should have been officially conducted by the Petitioner's former employer, and was *not*, the Petitioner sought assistance from qualified and professional independent classification specialists. The individual most credible was Paul Katz, as he was formerly the Assistant Director for the Office of Personnel Management (OPM). While employed, Mr. Katz designed and managed the government's position classification system covering approximately two million workers. Because he created the system, he knew "in depth" its intent and the results to be achieved. The Petitioner ultimately retained Mr. Katz to conduct an evaluation of her former position #00577. The determination was that of a GS-12.

In further supporting a retroactive salary entitlement, the Petitioner relied upon a Comptroller General Decision B-196638, dated July 10, 1980, in the matter of Earl H. Carter - Claim for Backpay. The case states, in part, "As a general rule an administrative change in salary may not be retroactively effective in the absence of a statute so providing. 26 Comp. Gen. 706 (1947). However, we have permitted a retroactive personnel action where clerical or administrative errors occurred that prevented a personnel action from taking effect as originally intended, deprived an employee of a

right granted by statute or regulation, or would result in failure to carry out a nondiscretionary administrative regulation or policy if not adjusted retroactively..." As stated by (i) above, the Petitioner's former agency failed to implement *nondiscretionary*, and *mandatory* application of newly revised position classification standards against the Petitioner's position; thus, the Petitioner was never awarded a compatible salary entitlement with the job duties she was performing. Supposedly, *all* other Management Analysts in the 343 job series had the standards applied to their positions. Where applicable, positions were upgraded and the encumbents received a salary increase. The Petitioner, with an identical job title and job series, was denied equal treatment with Position #00577.

Based upon the aforementioned regulatory authorities, the Petitioner maintains that her claim is highly meritorious.

(iii) The demonstrated inability of the pro se party to retain counsel by other means; and

The Petitioner sustained a job-related illness in February 1994. She has not worked since that date. She has been under the weekly care of a psychiatrist from 1994 to the current period. She is currently disabled and receiving Workers' Compensation benefits from the U. S. Department of Labor (DOL). As of January 2008, her case is under review with the DOL, so the Petitioner does not know whether or not her benefits will be continued for another year. Her benefits are reviewed on a yearly basis. In the event her benefits are terminated, she will have zero incoming monies. She does not receive a retirement annuity, social security benefits or life insurance payments. She does not have income from any other source. She has been unable to sell her home or secure an equity loan. The value of her home has declined greatly in the current housing

market. The Petitioner has a voluminous number of credit card debts. Her checking account contains a minuscule amount of $29.57.

The Petitioner provides financial support for her elderly mother of eighty-eight (88) years old. She has been diagnosed with Alzheimer's disease and is incapable of maintaining her needs for daily living. The Petitioner shops and pays for her mother's new clothing, dry cleaning, groceries, and an endless supply of toiletries. During the past twelve months, she also paid for furniture and bedding as well as her mother's medical needs to include the dentist, foot doctor, and her regular physician. Visits to her regular physician are every four (4) weeks, and the Podiatrist every seven (7) weeks. A daily companion also had to be hired for her mother. The Petitioner has helped financially with her mother's housing costs. In the past twelve months, the Petitioner has spent approximately $9,827.00.

The Petitioner further provides financial support to her sister-in-law who is a single mother with two minor children. Initially, she sent checks for $1,000, but now provides smaller monthly support payments. Her sister-in-law has been unemployed and recently lost her home. She was unable to pay the mortgage. The Petitioner's sister-in-law greatly relies upon the Petitioner for financial assistance. In the past twelve months, the Petitioner has spent approximately $2,400.00.

Additionally, the Petitioner provides financial support to her son who has had personal difficulties. He currently lives under the Petitioner's roof. She also provides financial support for clothing, meals, and medical needs. In the past twelve months, the Petitioner has spent approximately $11,400.00.

Given Petitioner's financial situation, she cannot afford legal counsel. She contends that her disability benefits have already been stretched to the limit in supporting herself, her mother, her sister-in-law with children and her son.

(iv) The degree to which the interests of justice will be served by appointment of counsel, including the benefit the Court may derive from the assistance of the appointed counsel.

<u>The Interests of Justice and Appointment of Counsel</u>

The Petitioner has corresponded several times with her former agency, the Inspector General's Office, Department of the Army, higher headquarters, and her Congressional representative, seeking an appropriate and equitable resolution to her claim. It never occurred. The Petitioner also sought assistance from OPM, the United States Office of Special Counsel (OSC), and the United States Merit Systems Protection Board. Again, there was a lack of success; however, the Petitioner maintains that the OSC, as an investigative agency, should have delved further into her complaint by contacting the head of her former agency and conducting an investigation relevant to the actions taken, or lack thereof, by the administrative agency (<u>not</u> higher headquarters).

The Petitioner is unable to pursue her complaint in Court against her former employer as she is precluded from doing so in accordance with a stipulation settlement agreement under *Minehan v. Caldera*, Docket Number 98-CV-0063 PLF/JMF. The agreement permits her to file a Petition for a Writ of Mandamus in seeking relief.

Appointment of Counsel is monumental if the interests of justice are to prevail. The above cited policy and regulatory authorities are federally mandated; yet, Walter Reed Army Medical Center, as a Federal sector organization, <u>violated the very laws it</u>

<u>was obligated to abide by</u>. It is in the interests of justice that our Federal government be held to a very high standard and that it operates under the same laws it has created for our Democracy. Every working citizen wants the assurance of knowing that their salaries are commensurate with duties performed. Equal Pay for Work of Equal Value is a highly visible issue of "national" public interest.

She prays that having Court appointed legal Counsel will assist her in reversing the negative responses she's repeatedly received, particularly from the U.S. Office of Special Counsel.

<u>Benefit to the Court and Appointment of Counsel</u>

The Petitioner is not an attorney and does not know the law. As stated by iii above, she has had a medical disability over the past fourteen (14) years. As a result of her disabling condition, she is unable to present her case *pro se* in Court.

To date, the Petitioner has not been successful with the U.S. Office of Special Counsel. They used a "weeding out" process to dismiss her complaint and ultimately closed the file, even though the OSC contended that her complaint could have merit. She believes that attorney-to-attorney communication will be significantly more beneficial. She further believes that her previously submitted case to the OSC would not have been closed if an attorney had been initially involved.

The alleged "Federal" violations described by the Petitioner are extremely serious because they convey to society, *"Do as I say, but not as I do."* In the Petitioner's case, resolution can *only* be accomplished through the United States Office of Special Counsel; thus, the Writ for Mandamus coupled with appointed Counsel is the Petitioner's only remaining hope for justice to prevail.

## CERTIFICATION

I, Susan H. Minehan, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

_____       _____
Susan H. Minehan, Petitioner                Date Executed: March 17, 2008
13733 Town Line Road
Silver Spring, Maryland 20906-2113
(H) (301) 871-1337